## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| VF OUTDOOR, LLC, a Delaware company and W-D APPAREL COMPANY, LLC a Delaware company, | Civil Action No.: _____ |
| *Plaintiffs*, | **COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS** |
| v. | |
| HATBOX OF ROCKLAND COUNTY INC. a New York corporation, QUALITY HATS INC., a New Jersey corporation, MITCHELL ELLENBOGEN, an individual, JEB ENTERPRISES LLC, a New Jersey limited liability company, JOSEPH ELLENBOGEN an individual, and JOHN DOES, 1-10, | |
| *Defendants*. | **JURY DEMAND** |

Plaintiffs VF Outdoor, LLC and W-D Apparel Company, LLC (collectively, "Dickies" or "Plaintiffs"), bring this action against Defendants Hatbox of Rockland County Inc., Quality Hats Inc., Mitchell Ellenbogen, Jeb Enterprises LLC, Joseph Ellenbogen, and John Does 1-10 (collectively, "Defendants") for: (1): trademark infringement in violation of the LANHAM ACT, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) unfair competition in violation of the LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A); (3) false advertising in violation of the LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B); (4) trademark infringement in violation of TEX. BUS. & COM. CODE § 16.102; and (5) unfair competition under Texas common law. These claims arise from Defendants' misappropriation of Dickies' trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Dickies' trademarks to unwitting customers. In support of their complaint, Dickies states as follows:

# I.     PARTIES

1.      Plaintiff VF Outdoor, LLC is a Delaware limited liability company.  Dickies, the division of VF Outdoor, LLC upon whose behalf this action is being brought, has its principal place of business located in Fort Worth, Texas.

2.      Plaintiff W-D Apparel Company, LLC is a Delaware limited liability company with its principal place of business located in Wilmington, Delaware.

3.      Defendant Hatbox of Rockland County Inc. ("Hatbox") is a New York corporation that has its principal place of business in Monsey, New York.  The certificate of incorporation for Hatbox that was filed with the New York Department of State directs the New York Secretary of State to mail process to Hatbox at 71 Route 59, Monsey, New York 10952.

4.      Defendant Quality Hats Inc. ("Quality Hats") is a New Jersey corporation that has its principal place of business located at 440 Glenn Road, Jackson, New Jersey 08527.  The articles of incorporation for Quality Hats that were filed with the State of New Jersey list 440 Glenn Road, Jackson, New Jersey 08527 as the registered office of Quality Hats.

5.      Defendant Mitchell Ellenbogen is a natural person who is the owner and operator of Hatbox and Quality Hats.  Upon information and belief, Mitchell Ellenbogen resides at 440 Glenn Road, Jackson, New Jersey 08527 or 1938 New York Avenue, Brooklyn, New York 11210.

6.      Defendant Jeb Enterprises LLC ("Jeb Enterprises") is a New Jersey limited liability company that has its principal place of business located at 8 Shenandoah Drive, Lakewood, New Jersey 08701.  The certificate of formation for Jeb Enterprises that was filed with the State of New Jersey lists 8 Shenandoah Drive, Lakewood, New Jersey 08701 as the registered office and main business address of Jeb Enterprises.

7.     Upon information and belief, Defendant Joseph Ellenbogen is a natural person who, upon information and belief, is the sole member of Jeb Enterprises.  The certificate of formation Jeb Enterprises lists Joseph Ellenbogen as a member of the LLC and does not list any individuals as members or managers of the LLC. Upon information and belief, Joseph Ellenbogen resides at 8 Shenandoah Drive, Lakewood, New Jersey 08701.

8.     Upon information and belief, Hatbox, Quality Hats, Mitchell Ellenbogen, Jeb Enterprises, and Joseph Ellenbogen collectively operate third-party storefronts on www.amazon.com ("Amazon") that are currently called "The Icon Group" (Merchant ID number: A3L62QKSGA4SE5) and "HB INC." (Merchant ID number: A2MKMYR9E88J5H) (collectively, the "Storefronts"), and which are selling and have sold infringing products bearing Dickies' trademarks.    The    Storefronts    can    be    accessed,    respectively,    at https://www.amazon.com/sp?seller=A3L62QKSGA4SE5                                    and https://www.amazon.com/sp?seller=A2MKMYR9E88J5H.

9.     Upon information and belief, Mitchell Ellenbogen is in control of, a principal of, and primarily responsible for the actions of Hatbox and Quality Hats.

10.    Dickies asserts claims against Mitchell Ellenbogen in both his individual capacity as well as his capacity as a corporate officer of Hatbox and Quality Hats.

11.    Mitchell Ellenbogen directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Dickies' trademarks by Hatbox and Quality Hats Accordingly, Mitchell Ellbogen is personally liable for infringing activities of Hatbox and Quality Hats without regard to piercing the corporate veil.

12.    Alternatively, Hatbox and Quality Hats follow so few corporate formalities and are so dominated by Mitchell Ellenbogen that they are merely alter egos of Mitchell Ellenbogen.  This

is reflected, in part, by the fact that its registered office and only place of business of Quality Hats is a residence owned by Mitchell Ellenbogen, and he is the only director of the company. Accordingly, Dickies is entitled to pierce the corporate veils of Hatbox and Quality Hats and hold Mitchell Ellenbogen personally liable for the infringing activities of Hatbox and Quality Hats.

13.     Upon information and belief, Joseph Ellenbogen is the sole member of, in control of, and primarily responsible for the actions of Jeb Enterprises.

14.     Dickies asserts claims against Joseph Ellenbogen in both his individual capacity as well as his capacity as a member of Jeb Enterprises.

15.     Joseph Ellenbogen directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Dickies' trademarks by Jeb Enterprises. Accordingly, Joseph Ellbogen is personally liable for infringing activities of Jeb Enterprises without regard to piercing the corporate veil.

16.     Alternatively, Jeb Enterprises follows so few corporate formalities and is so dominated by Joseph Ellenbogen that it is merely an alter ego of Joseph Ellenbogen.  This is reflected, in part, by the facts that: (i) Joseph Ellenbogen is the sole member listed on the certificate of formation of Jeb Enterprises, and (ii) the "main business address" that is listed the certificate of formation for Jeb Enterprises is Joseph Ellenbogen's home residence.  Accordingly, Dickies is entitled to pierce the corporate veil of Jeb Enterprises and hold Joseph Ellenbogen personally liable for the infringing activities of Jeb Enterprises.

17.     Dickies believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Dickies.  Therefore, Dickies sues these Defendants

by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Dickies will seek leave to amend this Complaint accordingly.  If Dickies does not identify any such parties, it will dismiss these Defendants from this action.

## II.     JURISDICTION

18.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Dickies' federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of Texas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

19.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Texas and established sufficient minimum contacts with Texas by, among other things, advertising and selling infringing products bearing Dickies' trademarks to consumers within Texas through an interactive commercial website through the regular course of business, with knowledge that Dickies is located in Texas and is harmed in Texas as a result of Defendants' sales of infringing products to Texas residents.  Defendants know that Dickies is located in Texas, among other reasons, because Defendants received cease-and-desist letters from Dickies that identified VF Outdoor, LLC's "Dickies" division as being located in Texas.  Dickies' claims arise out of Defendants' sales of infringing products bearing Dickies' trademarks to Texas residents through the regular course of business.

20.     Defendants have created two, and potentially more, interactive storefronts on Amazon.  Through the Storefronts, Defendants actively advertise, market, sell, ship, and distribute infringing products bearing Dickies' trademarks in Texas and to Texas residents.  Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the

impendency of this action, and have not taken any steps to prevent residents of Texas from purchasing products bearing Dickies' trademarks from Defendants' Storefronts.

21.     Moreover, by utilizing Amazon's "Fulfillment by Amazon" service, Defendants have agreed to permit Amazon to store their products in Amazon warehouses located across the country, including in Texas, and agree to have their products shipped to residents of all 50 states. Given that Defendants are selling a high volume of infringing products bearing Dickies' trademarks, it is exceedingly likely that large quantities of infringing products bearing Dickies' trademarks, owned by Defendants, are being stored within Texas by Amazon before the products are purchased by residents of Texas.

22.     Defendants' activities in Texas have been significant and they have made substantial and regular sales of infringing products bearing Dickies' trademarks to residents of Texas.

### III.   VENUE

23.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Dickies' claims occurred within this judicial district.

### IV.   FACTUAL ALLEGATIONS

**Dickies and Its Trademarks**

24.     Dickies is among the largest workwear manufacturers in the world, with a global presence stretching from the United States to the European Union to a host of other countries, including South Africa, Australia, Russia, Chile, Japan, Iceland, Canada, and Mexico.

25.     Dickies manufactures and sells a wide variety of apparel, including work pants and work shirts as well as items such as women's workwear, chore coats, and denim jeans (collectively, "Dickies Products").

26.     Dickies allows Dickies Products to be sold to end-user consumers in the United States only by: (1) Dickies itself (through the Dickies website, https://www.dickies.com, and brick-and-mortar stores owned and operated by Dickies); and (2) distributors and retailers who are expressly authorized by Dickies to sell Dickies Products in brick-and-mortar locations and/or on the Internet (collectively, "Authorized Sellers").

27.     Dickies allows Authorized Sellers to sell Dickies Products in approved channels only and require Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Dickies Rules").

28.     Dickies devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By allowing end-user consumers to purchase Dickies Products only from Dickies itself or from Authorized Sellers who are required to follow the quality controls and other requirements in the Dickies Rules, Dickies ensures that consumers receive products that are subject to their quality controls and maintain the integrity and reputation of their brands.  In the highly competitive workware market, quality and customer service are fundamental parts of a consumer's decision to purchase a product.

29.     To promote and protect the "Dickies" brand, W-D Apparel Company, LLC owns and/or has registered numerous trademarks with the United States Patent and Trademark Office ("USPTO") with respect to Dickies' brand and products, including DICKIES® (U.S. Trademark Reg. Nos.; 594,540; 594,541; 609,147; 625,855; 1,267,257; 1,566,088; 2,599,332; 2,613,484; 2,666,109; 3,063,324; and 4,473,451) (collectively, the "Dickies Registered Trademarks").  W-D Apparel Company, LLC has also applied for the following trademarks with the USPTO:  Serial Nos. 88,927,332; 88,927,256; 88,896,666; 88,896,658. W-D Apparel Company, LLC is a wholly

owned subsidiary of VF Outdoor, LLC.

30.     The registration for each of the Dickies Registered Trademarks is valid, subsisting, and in full force and effect.

31.     Dickies actively uses and markets the Dickies Registered Trademarks in commerce.

32.     Consumers recognize the Dickies Registered Trademarks as being associated with Plaintiffs.

33.     Due to the superior quality and exclusive distribution of Dickies Products, and because Plaintiffs are recognized as the source of high-quality products, the Dickies Registered Trademarks have enormous value.

**The Defendants**

34.     Upon information and belief, Defendant Mitchell Ellenbogen owns and operates a series of brick-and-mortar menswear retail locations under the name "Hat Box" ("Hat Box B & M").     Per the website, Hat Box B & M has eight retail locations. *See* https://hatboxmenswear.com/pages/our-locations

35.     Upon information and belief, Hat Box B & M owns and operates the "HB INC." storefront on Amazon.   "HB INC." sells several items marketed under the "Hat Box" name, as well as products bearing the Dickies Registered Trademarks.   Upon information and belief, Hat Box B & M and Defendant Mitchell Ellenbogen have used their distribution channels for their brick-and-mortar stores to divert products onto Amazon.

36.     Upon information and belief, Defendant Joseph Ellenbogen is the son of Defendant Mitchell Ellenbogen and owns and operates "The Icon Group" storefront on Amazon, which also sells products bearing the Dickies Registered Trademarks.   Upon information and belief, Mitchell Ellenbogen and Hatbox have permitted Joseph Ellenbogen to utilize the Hat Box B & M

distribution channels for their brick-and-mortar stores to divert products onto Amazon.

**Online Marketplaces and the Challenge They Present to Dickies Product Quality**

37.     E-commerce retail sales have exploded over the past decade.  From 2009 to the end of Q1 in 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 16.1%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (August 18, 2020), https://fred.stlouisfed.org/series/ECOMPCTSA.

38.     In 2019, consumers spent $601.75 billion on e-commerce sales, a 14.9% increase from 2018.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2019, United States consumers spent $221.95 billion in e-commerce sales on Amazon, a 25.3% increase from 2018.  *See* Jessica Young, *U.S. ecommerce sales grow 14.9% in 2019*, DIGITAL COMMERCE 360 (February 19, 2020), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

39.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a manufacturer's ability to control the quality of its products.

40.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

41.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain

a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

42.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

43.     Third-party sellers on Amazon may also sell counterfeit items or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

44.     For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security,

*Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id*. at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35.

45.    The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

46.    The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under

current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

47.     In its 2018 and 2019 annual reports to its shareholders, Amazon also admitted that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm;  Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at*  https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.     Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

48.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

49.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

50.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing

from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "By [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

51.    For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

52.    When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

53.    Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews. Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

54.    Online product reviews significantly impact a brand's reputation. Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews. Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

55.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

56.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019,  https://www.foxbusiness .com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

57.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011,  https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

58.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

**Dickies Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers**

59.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing.  These negative reviews injure consumer perceptions of a brand's quality and reputation, as well as its

placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

60.     Dickies has been a victim of the issues caused by unauthorized sellers on online marketplaces.   Numerous consumers who purchased products bearing Dickies Registered Trademarks from unauthorized sellers, like Defendants, have written negative reviews where they complained of receiving products that were damaged, mislabeled, or of otherwise poor quality.

61.     For example, Defendants have offered for sale the "Dickies Men's Original 874 Work Pant" product seen in the screenshot below.



62.     As seen in the following screenshots, numerous consumers have left negative reviews of this product, complaining of receiving products that were damaged, mislabeled, or otherwise defective:



haeli m allen

⭐☆☆☆☆ **These are great work pants**

Reviewed in the United States on June 15, 2018

Size: 34W x 32L | Color: Maroon | **Verified Purchase**

These are work pants, hence the reason my husband buys these 874 dickies. Problem is you can't confidently order these online. There is no quality control. If you want dickies YOU HAVE TO BUY LOCAL!! I ordered 3 pairs of 34x32 for my husband. One pair was correct in size, the other two were at least 2 inches smaller in the waist despite being labeled 34x32. I should have read through the reviews more closely because I see that this is a problem that's been happening for a looong time. We buy online to save on trips to town from the ranch, but now we have to go In to return these to the UPS terminal anyhow... Defeats the purpose of buying this product online. Live and learn 😁

4 people found this helpful

Helpful | ⌄ Comment | Report abuse



Someone

⭐☆☆☆☆ **Pants not finished being manufactured and too small**

Reviewed in the United States on May 8, 2020

Size: 44W x 37L | Color: Black | **Verified Purchase**

Item purchased:
1 of: Dickies Men's Big and Tall Original 874 Work Pant, Black, 44W x 37L

Unfinished:
Pants were not finished being manufactured. Bottom of both legs were not sewn, had a raw cut with a zigzag pattern with no hem.

Size:
My height is 6'6" with about 44 waist. Pants are too small in the waist and fit like tight form fitting pants.
Could not get on past my butt. 44 waist from other brands fits me. Have worn Dickies Jeans in the past which fit true to size. Something was wrong with these 874 Work Pant seemed several sizes too small.

Finale:
Returned this item easy, got refund.

2 people found this helpful

Helpful | ⌄ Comment | Report abuse



Mike H.

⭐☆☆☆☆ **Bought two pairs of the same pants. One of them showed up with un-hemmed legs**

Reviewed in the United States on July 17, 2020

Size: 32W x 32L | Color: Khaki | **Verified Purchase**

Amazon (or it's sellers) strikes again. I'm reading more stories about defective, possibly fake or used products being sold lately. I guess that's to be expected when you don't have direct control of the products.

Bought two of the same pants and two shirts. One pair of pants showed up with un-hemmed legs. How this gets by quality control is a mystery. A +1 for Amazon returns as usual, though. I chose the exact replacement option. We'll see how that works.

UPDATE: Replacement pair arrived un-hemmed as well. Didn't see any indication in the description that 32x32 Khaki pants would be un-hemmed but I suppose I'll try another color and see. Selected refund this time.

One person found this helpful

Helpful | ⌄ Comment | Report abuse



63.     Another Dickies-branded product listing that Defendants have offered for sale is

the "Dickies Men's Short-Sleeve Coverall."



64.     Consumers of this product have left reviews similarly complaining of receiving

mislabeled, damaged, or otherwise defective merchandise:







65.     The foregoing reviews are only a sample of the negative reviews that appear on Amazon of products bearing the Dickies Registered Trademarks that are sold by Defendants. Purchasers of other products bearing the Dickies Registered Trademarks sold by Defendants on Amazon have also left negative reviews of the products.

66.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of products bearing the Dickies Registered Trademarks on Amazon and are not subject to Dickies' quality controls, however, it is likely that some of the foregoing negative reviews—and the many

similar reviews of Dickies Products that appear on the Amazon website—were written by customers who purchased products bearing the Dickies Registered Trademarks from Defendants.

**Dickies Has Implemented Strict Quality Controls to Ensure Product Quality, Particularly on Online Marketplaces**

67.     Dickies' distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the Dickies Registered Trademarks by unauthorized sellers like Defendants who do not abide by Dickies' quality controls.  The goal of Dickies' quality control program is to ensure that consumers who buy Dickies products, including ones buying online, receive the high-quality products and services that they expect with the Dickies name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Dickies brand.

68.     Dickies abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

69.     Dickies' ability to exercise its quality controls is essential to the integrity and quality of Dickies products, as well as the value of the Dickies Registered Trademarks and other intellectual property.

70.     Dickies' quality controls begin with requiring that all sales of Dickies products take place through Dickies' website, Dickies' retail stores, or through Authorized Sellers.  This basic step ensures that everyone who is selling Dickies products is ultimately subject to Dickies' quality control requirements.

71.     Dickies carefully vets prospective Authorized Sellers to ensure that only those applicants with a reputation for and a commitment to quality are permitted to become Authorized Sellers of Dickies products.

72.     Authorized Sellers are required by contract to sell products only in certain channels and to abide by Dickies' policies and procedures, including, without limitation, the Authorized Retailer Policy, the Authorized Distributor Policy, and the National Brand Protection Policy (collectively, the "Dickies Rules").

73.     Among other conditions, the Dickies Rules require Authorized Sellers to purchase Dickies products only from Dickies directly or authorized distributors approved by Dickies.  This restriction ensures that the chain of custody can be established for all Dickies products sold by Authorized Sellers, and thus prevents counterfeits, secondhand goods, or other low-quality products from entering into the distribution chain.  The Dickies Rules also require Authorized Sellers to sell only to end users or to retailers approved by Dickies, thus guarding against leaks in the chain of distribution.

74.     The Dickies Rules prohibit Authorized Sellers from altering any Dickies products or packaging without Dickies' consent or selling Dickies products outside of approved Dickies-branded packaging.

75.     The Dickies Rules also require Authorized Sellers to give consumers instructions about Dickies' products and the guarantee and services that come with them.  These requirements ensure that consumers get all the information they need and service they expect related to Dickies products.

76.     Authorized Sellers are subject to auditing and review upon request by Dickies to ensure that the Dickies Rules are being followed.

77.     It is only by limiting authorized sales to Authorized Sellers who have access to, and are required to follow, the Dickies Rules that Dickies is able to ensure the satisfaction of consumers and to maintain the integrity and reputation of the Dickies brand.

**Dickies Exercises Additional Quality Controls over Products Sold Online**

78.     As shown in consumer reviews cited above (¶¶ 62-66), Dickies products sold online are more susceptible to quality and authenticity problems as consumers cannot see or touch products before they buy them.  These problems are especially severe on online marketplaces such as Amazon, where sellers' are identities are obscured, sellers are not required to disclose whether they are an authorized seller, and many sellers may share a single product listing page.

79.     Accordingly, Dickies has placed additional quality control requirements on Authorized Sellers who it allows to sell Dickies Products online ("Authorized Online Sellers"), which are in addition to those that apply to all Authorized Sellers.

80.     Dickies will only approve an Authorized Online Seller's website where it is clear that the website is operated by the Authorized Online Seller in their own name, thus preventing sales by anonymous online sellers who are not accountable to consumers or Dickies and making sure that consumers always know who they are buying from, the way they would know what store they are buying from when shopping brick-and-mortar.

81.     Authorized Online Sellers are also prohibited from selling anonymously and required to use reasonable efforts to respond to all consumer feedback and provide copies of the consumer feedback and related material to Dickies upon request.  These requirements allow the consumer to identify the seller and know who to contact to address issues, as well as allowing Dickies to quickly identify and address any quality issues that consumers encounter.

82.     Dickies also operates an Online Quality Control Auditing Program, under which it periodically examines and conducts test purchases from all authorized websites to ensure that Dickies' quality control requirements are being followed.

83.     Because of the unique nature of the online marketplaces, Dickies permits none of its Authorized Online Sellers to operate as a third-party seller on online marketplace websites,

including Amazon, without its prior written consent.

84.     These quality controls are essential to the reputation of the Dickies Registered Trademarks because they minimize the risk that consumers purchasing Dickies products online will receive poor-quality or counterfeit products, and allow Dickies to quickly address any quality issues that do arise.

**Genuine Dickies Products Come with Dickies' Satisfaction Guarantee; The Products Sold by Defendants Do Not**

85.     Dickies provides customers who purchase genuine Dickies Products from Dickies itself or from Authorized Sellers with the Dickies Satisfaction Guarantee (the "Satisfaction Guarantee").  The Satisfaction Guarantee allows a customer who is dissatisfied with a Dickies product for any reason to return the product to Dickies for a full refund, replacement, or gift card. *See Satisfaction Guarantee & Returns, available at* https://www.dickies.com/returns.html.  Such statements are incorporated herein.

86.     Dickies extends the Satisfaction Guarantee only to products that were sold by sellers that are subject to Dickies' quality controls: *i.e.*, products purchased from Dickies itself or from an Authorized Seller.  Because products sold by unauthorized sellers are not subject to Dickies' quality controls and Dickies cannot ensure the quality of such products, Dickies does not extend the Satisfaction Guarantee to products sold by unauthorized sellers, including Defendants. As shown by the consumer complaints cited in ¶¶ 62-66, unauthorized sellers frequently sell products that are counterfeit, seconds, outside of original packaging, used, or damaged.

87.     All individuals and entities—including Authorized Sellers—are prohibited from selling Dickies products on Amazon and other third-party marketplaces without Dickies' prior written consent.  Accordingly, any Dickies product sold on a third-party marketplace such as Amazon without the prior written consent of Dickies does not come with the Satisfaction

Guarantee.  The Satisfaction Guarantee is a material component of genuine Dickies Products. Consumers who purchase Dickies Products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Dickies stands behind the product, and that they can return the product to Dickies for a full refund, replacement, or gift card if they are dissatisfied.

88.     Consumers would find it material and relevant to their purchasing decision to know whether a Dickies Product they are considering buying is covered by the Satisfaction Guarantee. If a consumer knew a product did not come with the Satisfaction Guarantee, the consumer would be less likely to purchase the product.

**Defendants' Unauthorized Sales of Non-Genuine Products Bearing the Dickies Registered Trademarks**

89.     Due to the risks to consumers and the reputational concerns associated with the illegal sale of products bearing the Dickies Registered Trademarks by unauthorized Internet sellers, Dickies actively monitors the sale of Dickies Products online.  In the course this monitoring, Dickies discovered a high volume of products bearing the Dickies Registered Trademarks being illegally sold by Defendants on Amazon through the Storefronts in or about January 2020.

90.     Both Storefronts offer products for sale as "Fulfilled by Amazon," often referred to as "FBA":





91.    The FBA service requires Defendants to ship their products to Amazon's warehouses and, if and when sold, the products are shipped by Amazon to the buyer.  Amazon does not contact sellers for approval of the purchase.  Defendants retain ownership of the products they store at Amazon warehouses until they are purchased by consumers.

92.    By selling items FBA, Defendants agreed to have their products stored across the country, including in any one of the nearly 20 Amazon fulfillment centers located in Texas.  *See* https://www.bizjournals.com/dallas/news/2020/02/04/amazon-dallas-fort-worth-fulfillment-centers.html

93.    As part of its investigation into the Storefronts, Dickies examined consumer reviews of both Storefronts and found alarming quality and customer service issues that pervaded both Storefronts.

94.    "The Icon Group" has an abysmal 50% positive rating for the past 30 days and its reviews indicate that customers have been very dissatisfied with products purchased from and customer service offered by "The Icon Group."

95.    For example, many reviews allege that "The Icon Group" storefront has sold counterfeit, damaged, or poor quality products, specifically items bearing the Dickies Trademarks:

★☆☆☆☆    "*Do not buy these pants! They are knockoff, may have dickies sticker but they are not dickies product.*"
By Minerva F on July 17, 2020.

★☆☆☆☆    "*These have to be fake pants the quality is awful and nothing like the other dickie pants I own.*"
By dylan ewing on March 16, 2020.

★☆☆☆☆    "*Defective product, service not provided. purchased prime, being jerked around on return.*"
By Amazon Customer on August 16, 2020.

★☆☆☆☆    "*when i got the 2 pack i opened it up one of the shirts had a rip in the back with a green piece of tape next to the rip. i returned one shirt and did not get a refund on the one shirt.*"
Read less
By Marie J. on June 20, 2020.

★☆☆☆☆    "*If I could give zero stars I would. These shirts were not a large. At all. Maybe if you're 9 years old. But this product is advertised as a Mens size and it isnt. I have medium size shirts which are larger than this. Also the quality was terrible. Most likely a fake/counterfeit.*"
Read less
By Nick McDougall on March 10, 2020.

 *"The shirt arrived early so that was a good thing. Earlier I bought the exact same shirt in black, same size, but this one is noticeably different in size, so be careful with that.*

Read less

By Tim Wheeler on February 8, 2020.

 *"Defective"*

By Amazon Customer on September 16, 2020.

96.     An alarming number of customers have also complained about the rude, non-responsive, or just plain unethical conduct of "The Icon Group" storefront in responding to (or, more accurately, *failing* to respond to) customer inquiries, including refusing to refund customers their money on returned items:

 *"I never received my order. I requested a refund for 2 weeks and third party said they had issued refund but that was not true. Very dishonest company. Never order anything from them. Worst experience I have ever had with Amazon."*

Read less

By private on October 20, 2020.

 *"I received a size other than that which was ordered. Free shipping when purchased, but I have to pay the return shipping for their mistake! I will NOT be buying from THE ICON GROUP again."*

Read less

By Jeremy Walton on October 19, 2020.

 *"The refund is not showing up in my account after confirming they have received the item"*

By Narinder Jain on October 18, 2020.

 *"Requested return label for defective / improper item. Seller has not provided return label or info. First request was sent on 8/17. Second request was sent on 8/29. 3rd request was sent on 10/3. Seller only responds "please allow us some time to look into this matter". I believe 2 months is mote than enough time to "look into the mater". Thankfully Amazon A to Z guarantee refunded the cost."*

Read less

By B on October 12, 2020.

 *"Seller was difficult and does not reply in a timely manner. Will not purchase from this seller again."*

By Shelby on May 30, 2020.

 "*I received the wrong item from the seller 10 days after being ordered. Seller requested photographs substantiating their error and demanded that I pay for return shipping even though I'm an Amazon Prime Customer. Contacted Amazon who stated to bad, how sad, were sorry but your out of luck with this seller. I would recommend avoiding this seller at all costs. UNACCEPTABLE!*"
Read less

By mkpi on April 12, 2020.

 "*Still have not received my order ,I'm starting to think some fraudulent activity here , this isn't my want Email says Small business give us time it's been more than a month I'm needless to say un happy,problem still not solved .*"
Read less

By Michael Lund on May 27, 2020.

 "*Seller sent me the wrong item. After I pointed this out and requested a refund they sent me a label for which I have to pay to return the wrong item they sent me. Many e-mails later no resolution. They won't reply, I guess if I want my refund I need to pay myself to ship it back.*"
Read less

By jk on July 10, 2020.

 "*I reached out to this seller multiple times via email/Amazon. They finally responded to my complaint of being charged $28.98 for 2 day shipping saying they weren't responsible for any shipping charges that were tacked on by the seller.. Its up to the seller whether or not they are going to sell their products at a lower cost and jack up the shipping rates.*"
Read less

By manuel sanchez jr. on April 7, 2020.

 "*Unreasonable delay in refunding me after returning product.*"
By Cristian Soria on May 16, 2020.

 "*I returned the product, but I didn't receive my refund, money back. Could you please provide it? Thanks*"
By Rejane V. on March 8, 2020.

97.     Consumers have also written similar complaints about products sold, and customer service provided, by the "HB INC." storefront:

 "*Your a piece of garbage keeping my money for 83 days and not deliver my product*"
By dougiestyle on October 26, 2020.

 "*It was unsewed on the side of P.J. large rip*"
By Linda on September 2, 2020.

 "*The zipper was broken and missing teeth also, and was covered up with green tape*"
By Diana Hafemeister on March 6, 2020.

> ★☆☆☆☆  "This is not even a 5.11 product, it's a knock off from China"
> By Craig S. on March 4, 2020.

> ★☆☆☆☆  "Why hasn't canceled order been refunded? Requested refund before orders shipped."
> By veronica williams on February 4, 2020.

> ★☆☆☆☆  "All 3 shirts were defective. These were Christmas Presents, had to pay seamstress to fix them. Have to return one big hole in it."
> By kbrock on December 19, 2019.

98.     These types of complaints about Defendants are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers on online marketplaces. Dickies allows its products to be sold only by Authorized Sellers, who are subject to and must follow the quality control and customer service requirements in the Dickies Rules, to prevent customers who purchase Dickies Products from suffering experiences like those described in the above complaints about Defendants.

**Defendants are Selling Defective Products Bearing the Dickies Registered Trademarks as "New" while Actively Concealing From Customers That They are Receiving Products Previously Designated as "Irregular"**

99.     Dickies conducted "test buys" of products bearing the Dickies Registered Trademarks from the Storefronts to assess the quality issues that pervade the negative reviews of the Storefronts.

100.     All of the product buys revealed that the Storefronts are listing Dickies Products under ASINs purporting to be "new," first run items, but are actually delivering items designated as "irregular," the designation for damaged, imperfect, or "second run" items.

101.     As part of Dickies' quality controls, the garments it manufactures are inspected for conformance with product specifications, including color, stitching, appropriate sizing, and overall appearance.

102.    When Dickies encounters products that are outside of Dickies' specifications, it stamps the product tag as "irregular":



103.    It also marks the garment itself in ink with a stamped "88" to designate the garment as irregular:



104.    Often, Dickies' product inspectors will mark the flaw in the garment with a piece of colored tape to allow for easy identification of the defect.

105.    Dickies sells the irregular items only through designated resellers, and it requires those resellers to clearly indicate that the items are "irregular."

106.    The products bearing the Dickies Registered Trademarks that Dickies purchased from the Storefronts were advertised and listed by Defendants as "new," first run items, but the

garments that Dickies received were irregulars.

107.    Specifically the "HB INC." storefront sold the item "Dickies Men's Original 874 Work Pant, Dark Navy, 32W x 34L" as "new," but the item received had an "88" stamp" and the tag had been cut to remove the "irregular" stamp:

 

108.    However, the product listing and order confirmation indicate that this item was listed and sold as "new":



109.    Likewise, the "Icon Group" storefront sold the item "Dickies Men's 7 1/2 Ounce Twill Deluxe Long Sleeve Coverall, Dark Navy, Large Regular" as new, but the item received was stamped irregular, included tape designating the flaw in the garment, and the tag was cut to remove the "irregular" stamp:







110.     Again, the product listing and order confirmation indicate that this item was listed and sold as "new":

**Items Ordered**
1 of: *Dickies Men's 7 1/2 Ounce Twill Deluxe Long Sleeve Coverall, Dark Navy, Large Regular*
Sold by: The Icon Group (seller profile)
Condition: New



111.     The test purchases also revealed that the items were individually marked with Fulfillment Network Stock Keeping Unit ("FNSKU") stickers. The FNSKU is the way that Amazon identifies a product as unique to the seller that has sent it to the Amazon fulfillment center. The presence of FNSKU stickers on the test purchases confirms that it was Defendants, and not

other third-party sellers on Amazon, who were responsible for selling "irregular" products bearing the Dickies Registered Trademarks as new.  In other words, Defendants' products have not been "comingled" with other sellers' products.

**Dickies Identifies Defendants as the Operators of the Storefronts**

112.    After Dickies discovered products bearing the Dickies Registered Trademarks being illegally sold on the Storefronts, Dickies conducted an investigation to determine who was operating the Storefronts.

113.    Through its investigation, Dickies determined that Defendants are responsible, at least in part, for the operation of the Storefronts.  Upon information and belief, additional entities and/or individuals may also assist in the operation of the Storefronts.

114.    On or about February 14, 2020, counsel for Dickies sent Defendants a cease-and-desist letter, demanding that they immediately cease selling products bearing the Dickies Registered Trademarks.

115.    This letter further notified Defendants that they were injuring Dickies in Texas through their illegal actions and that they would be subject to personal jurisdiction in Texas if they continued to engage in their conduct.

116.    Defendants continued to sell products bearing the Dickies Registered Trademarks on the Storefronts.

117.    Counsel for Dickies sent Defendants a second cease-and-desist letter on or about March 13, 2020.

118.    On or about March 16, 2020, Defendants sent Dickies a response letter, in which they indicated, among other things, their intention to continue selling products bearing the Dickies Registered Trademarks on Amazon.

119.    Since that time, Defendants have continued to sell products bearing the Dickies Registered Trademarks through both Storefronts.

120.    Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Dickies Registered Trademarks through their Storefronts.  Dickies estimates that, in the 30 days prior to the date of filing, Defendants have sold approximately $35,000.00 worth of infringing products through their Storefronts.

121.    By virtue of utilizing the Amazon "FBA" service, through their Storefronts, Defendants accept and fulfill orders from Texas residents for products bearing the Dickies Registered Trademarks and allow infringing products bearing the Dickies Registered Trademarks to be shipped to persons located in Texas through the regular course of business.  Indeed, by virtue of utilizing Amazon's FBA service, Defendants agree to sell and ship product to all 50 states.

122.    Defendants' disregard of Dickies' cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants are Infringing the Dickies Trademarks by Selling Products Bearing the Dickies Registered Trademarks That Are Not Subject To, Do Not Abide By, and Interfere with Dickies' Quality Controls and Customer Service Requirements**

123.    Defendants are not Authorized Sellers of Dickies products and are not subject to, and do not comply with, the Dickies Rules.

124.    Because Defendants are not Authorized Sellers of Dickies products, Dickies is unable to exercise control over the quality of products Defendants sell bearing the Dickies Registered Trademarks.

125.    Defendants directly violate Dickies' quality controls by selling as products bearing the Dickies Registered Trademarks as "new" when they have actually been marked as "irregular."

126.    The negative customer reviews of Defendants' Storefronts also show that Defendants are providing poor customer service and are selling products that are damaged, defective, or otherwise different from what customers had ordered.  Given the high number of customers who have complained about the quality of products they purchased from Defendants, including products bearing the Dickies Registered Trademarks, it is exceedingly likely that Defendants are responsible for some of the negative reviews of Dickies Products that appear elsewhere on the Amazon marketplace.  *See supra* ¶¶ 62-66.

127.    Defendants also interfere with Dickies' quality controls because Dickies is unable to audit Defendants' practices.  Therefore, among other things, Dickies cannot know if Defendants are sourcing products from reliable sources, inspecting products upon receipt, avoiding risky fulfillment practices such as commingling, ensuring that products are sold only in official and unaltered Dickies packaging, or providing good customer service.  Defendants' practices thus risk introducing counterfeit and other non-genuine products bearing the Dickies Registered Trademarks into the stream of commerce.

128.    The products Defendants sell are not genuine Dickies products because the products are not subject to, do not abide by, and interfere with Dickies' quality controls.

**Defendants are Infringing the Dickies Registered Trademarks by Selling Products Bearing the Dickies Registered Trademarks That Do Not Come with the Satisfaction Guarantee**

129.    As set forth above, genuine Dickies Products purchased from Dickies or Authorized Sellers come with the Satisfaction Guarantee because they comply with Dickies' quality controls, and this Satisfaction Guarantee is a material part of what consumers expect when they purchase Dickies Products.

130.    Because Defendants are not Authorized Sellers of Dickies Products and do not comply with Dickies' quality controls, the products they sell bearing the Dickies Registered

Trademarks do not come with the Satisfaction Guarantee.

131.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Dickies products.

132.    Defendants' unauthorized sale of non-genuine products bearing the Dickies Registered Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Dickies Products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Engaging in False Advertising by Falsely Representing That "Irregular" Products They Sell Are "New"**

133.    In addition to infringing on the Dickies Registered Trademarks, Defendants are also falsely advertising that the products they sell are "New" and defect-free.

134.    When a seller lists items on Amazon, Amazon requires the seller to identify the condition of the product for sale as one of the following:  "New"; "Renewed"; "Used – Like New or Open Box"; "Used – Very Good"; "Used – Good"; or "Used – Acceptable."  *See* https://sellercentral.amazon.com/gp/help/external/200339950.

135.    Defendants list all products bearing the Dickies Registered Trademarks they sell to consumers as "New."  As discussed above, however, the products that consumers actually receive when purchasing from these listings have been designated by Dickies' product inspectors as irregular products, and they bear visible marks—including a stamped "irregular" tag, an "88" stamp, and/or colored tape—that reveal them as outside Dickies' specifications for first run items.

136.    Pursuant to Amazon's policies, a product can be listed as "New" only if it is a "brand-new item."

**New:**

Just like it sounds. A brand-new item. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments. Original packaging is present for most New items but certain items like shoes may be re-boxed.

See https://sellercentral.amazon.com/gp/help/external/200339950.

137.   Defendants know that they are listing products as "New" that Dickies' product inspectors have designated as flawed and unsellable, except by designated resellers who clearly indicate that the products are "irregular."   Defendants' knowledge is shown by the fact that Defendants cut the tags of irregular products they sell, to remove the "IRREGULAR" stamp that was placed on the tag by Dickies' product inspectors.

138.   Defendants' actions are likely to deceive a substantial segment of potential consumers.   Consumers who purchase products listed on Amazon as "New," and with "IRREGULAR" stamps on their tags removed by Defendants, would not expect to receive products that Dickies' inspectors designated as "irregular."

139.   Defendants' deception is also material and likely to influence consumers' purchasing decision.   Consumers would not purchase the irregular products Defendants are selling—at least at the full price Defendants and other sellers of Dickies Products charge for a "new" product—if they knew the products Defendants are selling are irregular rather than new, first-run products.

140.   Dickies is injured by Defendants' false advertising.   Consumers think less of the Dickies brand, and may write negative online reviews of Dickies Products, when they receive products bearing the Dickies Registered Trademarks that they believe to be "new," but which are actually products that Dickies' inspectors designated as "irregular" products that cannot be sold to consumers unless they are clearly labeled as such.

**Dickies Has Suffered Substantial Harm as a Result of Defendants' Conduct**

141.   As set forth above, the unauthorized sale of products bearing the Dickies Registered Trademarks through unauthorized sellers such as Defendants has caused significant harm to the

Dickies brand.

142.    When a consumer receives a non-genuine, damaged, or other poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Dickies.  The consumer may also leave a negative online review of a Dickies Product.  For these reasons, Defendants' ongoing sale of non-genuine products bearing the Dickies Registered Trademarks harms the Dickies brand.

143.    Dickies has suffered, and will continue to suffer, significant monetary harm as a proximate result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

144.    Dickies has suffered, and will continue to suffer, irreparable harm as a proximate result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

145.    Dickies is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Dickies Registered Trademarks, causing continued irreparable harm to Dickies' reputation, goodwill, relationships, intellectual property, and brand integrity.

146.    Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

147.    Specifically, the product buys demonstrate that Defendants purposefully remove the "irregular" stamp on tags of products bearing the Dickies Registered Trademarks to conceal that the products were marked "irregular" and falsely represent them as new.

148.    Defendants' disregard of communications from Dickies and continued selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are

acting intentionally, willfully, and maliciously.

149.    Defendants' willful infringement of the Dickies Registered Trademarks and continued pattern of misconduct demonstrate intent to harm Dickies.

### FIRST CAUSE OF ACTION
### Trademark Infringement15 U.S.C. §§ 1114 and 1125(a)(1)(A)

150.    Dickies hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

151.    W-D Apparel Company, LLC is the owner of the Dickies Registered Trademarks.

152.    W-D Apparel Company, LLC has registered the Dickies Registered Trademarks with the United States Patent and Trademark Office.

153.    The Dickies Registered Trademarks are valid and subsisting trademarks in full force and effect.

154.    Defendants willfully and knowingly used, and continue to use, the Dickies Registered Trademarks in commerce for purposes of selling non-genuine products bearing the Dickies Registered Trademarks on the Internet without Dickies' consent.

155.    The products Defendants sell bearing the Dickies Registered Trademarks are not authorized for sale by Dickies.

156.    The products Defendants sell bearing the Dickies Registered Trademarks are materially different from genuine Dickies products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Dickies has established.

157.    The products Defendants sell bearing the Dickies Registered Trademarks are materially different from genuine Dickies products because they do not come with the Satisfaction Guarantee, which accompanies genuine Dickies products.

158.    Defendants' unauthorized sale of materially different products bearing the Dickies

Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Dickies products when they are not.

159.    Defendants' unauthorized sale of materially different products bearing the Dickies Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Dickies when, in fact, they are not.

160.    Defendants' unauthorized use of the Dickies Registered Trademarks has infringed upon and materially damaged the value of the Dickies Registered Trademarks and caused significant damage to Dickies' business relationships.

161.    As a proximate result of Defendants' actions, Dickies has suffered, and will continue to suffer immediate and irreparable harm.  Dickies has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

162.    Dickies is entitled to recover its damages caused by Defendants' infringement of the Dickies Registered Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

163.    Dickies is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Dickies will suffer irreparable harm.

164.    Dickies is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Dickies Registered Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)(1)(A)

165.     Dickies hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

166.     As set forth above, Defendants are selling non-genuine products bearing the Dickies Registered Trademarks that are materially different from genuine Dickies products.

167.     Defendants' sale of non-genuine products bearing the Dickies Registered Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Dickies when they are not.

168.     Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

169.     Dickies is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and unless Defendants are permanently enjoined, Dickies will suffer irreparable harm.

170.     Dickies is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

## THIRD CAUSE OF ACTION
### False Advertising
### 15 U.S.C. § 1125(a)(1)(B)

171.     Dickies hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

172.     As set forth above, in their listings on Amazon, Defendants willfully and knowingly used, and continue to use, the Dickies Registered Trademarks in interstate commerce for purposes

of advertising, promoting, and selling products bearing the Dickies Registered Trademarks without Dickies' consent.

173.    Defendants' advertisements and promotions of their products unlawfully using the Dickies' Registered Trademarks have been disseminated to the relevant purchasing public.

174.    As discussed above, Amazon requires sellers to identify the condition of products they sell.  Classifying a product as "New" on Amazon means that the product is "brand-new" and not flawed.

175.    Defendants are falsely advertising that the products they sell bearing the Dickies Registered Trademarks are "New," and have not been designated as unsellable by Dickies.

176.    These representations are false and misleading because the products Defendants sell bearing the Dickies Registered Trademarks have been designated by Dickies' product inspectors as flawed and unsellable, except by designated resellers who clearly indicate that the products are "irregular."

177.    Therefore, Defendants' use of the Dickies Registered Trademarks in connection with the unauthorized advertising, promotion, and sale of products misrepresents the nature, characteristics, qualities, and origin of the products.

178.    Defendants are well aware of their false advertising.  Defendants' knowledge is shown by the fact that Defendants cut the tags of irregular products they sell, to remove the "IRREGULAR" stamp that was placed on the tag by Dickies' product inspectors.

179.    Defendants' actions are likely to deceive a substantial segment of potential consumers.  Consumers who purchase products listed on Amazon as "New," and with "IRREGULAR" stamps on their tags removed by Defendants, would not expect to receive products that Dickies' inspectors designated as "irregular."

180.    Defendants' deception is also material and likely to influence consumers' purchasing decision.  Consumers would not purchase the irregular products Defendants are selling—at least at the full price Defendants and other sellers of Dickies Products charge for a "new" product—if they knew the products Defendants are selling are "irregular" rather than new, defect-free products.

181.    As a proximate result of Defendants' actions, Dickies has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

182.    Dickies is entitled to recover its damages caused by Defendants' false advertising and disgorge Defendants' profits from their unjust enrichment.

183.    Dickies is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' false advertising and unless Defendants are permanently enjoined, Dickies will suffer irreparable harm.

184.    Dickies is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in false advertising.

**FOURTH CAUSE OF ACTION**
**Trademark Infringement**
**Tex. Bus. & Com. Code § 16.102**

185.    Dickies hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

186.    The Dickies Registered Trademarks are distinctive and widely recognized by the consuming public.  Dickies' products are sold and purchased through its website, retail stores, and its network of Authorized Sellers throughout the United States, including Texas.

187.    Defendants willfully and knowingly used, and continue to use, the Dickies Registered Trademarks in commerce for purposes of selling non-genuine products bearing the Dickies Registered Trademarks in Texas without Dickies' consent.

188.    Defendants' unauthorized sale of products bearing the Dickies Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers as to the origin of the goods or services because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Dickies when they are not.

189.    Dickies is entitled to injunctive relief under Tex. Bus. & Com. Code § 16.102(c).

190.    Dickies is entitled to enhanced damages and attorneys' fees under Tex. Bus. & Com. Code § 16.102(d) because Defendants have acted with knowledge of the Dickies Registered Trademarks and in bad faith.

### FIFTH CAUSE OF ACTION
### Common Law Unfair Competition

191.    Dickies hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

192.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Dickies Registered Trademarks interferes with Dickies' quality controls and its ability to exercise quality control over products bearing the Dickies Registered Trademarks.

193.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Dickies Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Dickies Registered Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, Dickies' quality controls when, in fact, they are not.

194.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Dickies Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Dickies Registered Trademarks suggests that the products Defendants offer for sale are genuine Dickies products when, in fact, they are not.

195.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Dickies Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Dickies Registered Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Dickies when, in fact, they are not.

196.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine Dickies products when, in fact, they are not.

197.    Defendants' unauthorized sale of products bearing the Dickies Registered Trademarks and unauthorized use of the Dickies Registered Trademarks in advertising infringes the Dickies Registered Trademarks and constitutes unfair competition at common law.

198.    Defendants' unauthorized use of the Dickies Registered Trademarks has materially damaged the value of the Dickies Registered Trademarks, caused significant damage to Dickies' business relations, and infringed the Dickies Registered Trademarks.

199.    As a result, Dickies has suffered, and continues to suffer, immediate and irreparable harm.  Dickies has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

200.    Dickies is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be

harmed by their acts and omissions.

## V.  CONDITIONS PRECEDENT

201.    All conditions precedent to Dickies' claims for relief, if any, have occurred or have been performed.

## VI.  REQUEST FOR ATTORNEYS' FEES

202.    Dickies is entitled to recover its attorneys' fees and costs for this action, pursuant to the federal and state law identified herein, and Dickies hereby seeks such recovery from Defendants of all its reasonable and necessary attorneys' fees and costs for prosecuting this action and obtaining the relief requested herein.

## VII.  JURY DEMAND

203.    Plaintiff demands a trial by jury on all claims and issues so triable.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Dickies prays for relief and judgment as follows:

A.    Judgment in favor of Dickies and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Dickies Registered Trademarks;

ii)    Prohibiting the Enjoined Parties from using any of the Dickies Registered Trademarks in any manner, including advertising on the Internet;

iii)   Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Dickies Registered Trademarks;

iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Dickies Registered Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Dickies' products, or any of the Dickies Registered Trademarks;

vi)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Dickies Registered Trademarks which associate Dickies' products or the Dickies Registered Trademarks with the Enjoined Parties or the Enjoined Parties' websites; and

vii)   Requiring the Enjoined Parties to take all action to remove the Dickies Registered Trademarks from the Internet, including from the website www.amazon.com.

C.    An award of attorneys' fees, costs, and expenses.

D.    Such other and further relief as the Court deems just, equitable and proper.

DATE: October 29, 2020                    Respectfully submitted,

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:     (214) 981-3800
Facsimile:     (214) 981-3835

*Of Counsel:*

William D. Kloss, Jr.
*(pro hac vice* applications forthcoming)
Ohio Bar 0040854
wdklossjr@vorys.com
Martha Brewer Motley
*(pro hac vice* applications forthcoming
Ohio Bar 0083788
mbmotley@vorys.com
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 E. Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone:     (614) 464-6400
Facsimile:     (614) 719-6350


**ATTORNEY FOR PLAINTIFFS
VF OUTDOOR, LLC and W-D APPAREL
COMPANY, LLC**